**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Cincinnati Bar Assn. v. Hauck,* **Slip Opinion No. 2016-Ohio-7826.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-7826

CINCINNATI BAR ASSOCIATION *v*. HAUCK.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Cincinnati Bar Assn. v. Hauck,* Slip Opinion No. 2016-Ohio-7826.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct—Two-year suspension with second year stayed on conditions.*

(No. 2016-0260—Submitted May 3, 2016—Decided November 22, 2016.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2014-098.

———————————

**Per Curiam.**

**{¶ 1}** Respondent, John Wesche Hauck of Milford, Ohio, Attorney Registration No. 0023153, was admitted to the practice of law in Ohio in 1978.  On July 7, 2011, we suspended Hauck for 12 months with 6 months stayed on conditions for failing to maintain client funds in an interest-bearing trust account separate from his own funds, failing to maintain adequate records of client funds in

his possession, failing to notify his clients that he did not carry malpractice insurance, and engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. *Cincinnati Bar Assn. v. Hauck*, 129 Ohio St.3d 209, 2011-Ohio-3281, 951 N.E.2d 83. After finding Hauck in contempt of our prior order on March 5, 2012, we lifted the stay and required him to serve the full 12-month suspension. *In re Hauck*, 131 Ohio St.3d 1470, 2012-Ohio-849, 962 N.E.2d 801. We also suspended Hauck's license on November 1, 2011, based on his failure to timely register for the 2011-2013 biennium. *In re Attorney Registration Suspension of Hauck*, 130 Ohio St.3d 1420, 2011-Ohio-5627, 956 N.E.2d 310. He was reinstated to the practice of law on November 15, 2012. *Cincinnati Bar Assn. v. Hauck*, 133 Ohio St.3d 1232, 2012-Ohio-5271, 979 N.E.2d 345.

{¶ 2} In a December 15, 2014 complaint, relator, Cincinnati Bar Association, charged Hauck with violations of the Rules of Professional Conduct for failing to provide competent representation to a client; practicing law in violation of the regulation of the legal profession in Ohio; committing an illegal act that reflects adversely on his honesty or trustworthiness; engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; and engaging in conduct that is prejudicial to the administration of justice.

{¶ 3} The charges relate to a letter that Hauck sent on behalf of an alleged client, Richard Ellison, to the client's mother and stepfather ("parents") in violation of a civil protection order ("CPO"). The CPO prohibited Ellison from having any contact with his parents—including contact through another person. As a result of Hauck's conduct, Ellison was arrested, pleaded guilty to a second-degree-misdemeanor charge of attempting to violate the terms of the CPO, and was sentenced to 90 days in jail.

{¶ 4} After a two-day hearing, a panel of the Board of Professional Conduct found that Hauck committed all the charged misconduct and recommended that he be suspended from the practice of law for 12 months and be required to submit to

an evaluation by the Ohio Lawyers Assistance Program ("OLAP") and comply with all OLAP recommendations. Additionally, the panel recommended that Hauck be required to petition this court for reinstatement to the practice of law pursuant to Gov.Bar R. V(25). The board adopted the panel's findings of fact and conclusions of law, but believing that a longer period of actual suspension is necessary to protect the public from additional misconduct, the board recommends that Hauck be indefinitely suspended from the practice of law in Ohio.

{¶ 5} Hauck objects to the board's findings that Ellison was his client and that he committed an illegal act by preparing the letter on Ellison's behalf. He also objects to the panel's denial of his pre- and posthearing motions to dismiss the complaint on constitutional grounds and to the board's recommended sanction.

{¶ 6} We overrule Hauck's objections to the board's findings of fact and misconduct and adopt those findings as our own. But we sustain Hauck's objection to the board's recommended sanction in part. Accordingly, we suspend Hauck from the practice of law in Ohio for two years with the second year stayed on conditions, and we require him to petition this court for reinstatement to the practice law and to serve a period of monitored probation upon reinstatement.

**Misconduct**

{¶ 7} In October 2004, Ellison entered his parents' home through an unlocked garage, disconnected the phone, and waited three hours for them to return home. Although he claimed that he wanted to talk with them about longstanding family problems, he had duct tape, two pairs of handcuffs, a hammer, and a change of clothing in his possession when he confronted them. He thwarted his stepfather's attempt to leave the house—injuring him in the process—and grabbed the phone from his mother as she attempted to dial 9-1-1. *State v. Ellison*, 1st Dist. Hamilton No. C-050553, 2006-Ohio-2620, ¶ 2-4. In 2005, Ellison pleaded guilty to charges of aggravated burglary, kidnapping, and abduction arising out of the incident and was sentenced to six years in prison.

**{¶ 8}** In anticipation of Ellison's early release from prison, his mother obtained a CPO from the Hamilton County Domestic Relations Court on August 11, 2010.  The order—which was valid until August 10, 2015—prohibited Ellison from initiating any contact with his parents by "telephone, fax, e-mail, voice mail, delivery service, writings, or communications by any other means in person *or through another person*."  (Emphasis added.)

**{¶ 9}** Hauck met and befriended Ellison in September 2012.  Shortly thereafter, they began to discuss a letter that Ellison wanted to send to his parents in an effort to reconcile with them.  After months of discussion, Ellison began drafting the letter in late 2013 or early 2014.  Hauck encouraged Ellison to complete the letter, offered advice about the content and wording of the letter, and suggested that he ask his parents to move the court to terminate the CPO.

**{¶ 10}** Ellison was well aware that the CPO prohibited him from contacting his parents directly and believed that they would not open a letter that bore his return address.  Consequently, he asked for permission to use Hauck's letterhead and signature so that it would appear that the letter came directly from Hauck.  Because Hauck was reluctant to use his normal office letterhead, Ellison designed special letterhead for the letter that bore Hauck's name along with the title "ATTORNEY AT LAW."  Hauck agreed to edit Ellison's letter, print it on the newly designed letterhead, and adopt the content of the letter as his own by signing it.  Although the letterhead plainly identified Hauck as an attorney, he also inserted a disclaimer in the body of the letter, stating, "I should clarify that although I am an attorney, I'm not acting in that capacity here.  I am writing strictly as a friend and a Christian who wants to help."

**{¶ 11}** Ellison mailed the letter to his parents in early March 2014, unaware that his stepfather had passed away in September 2010.  Days after the mailing, Ellison was arrested and charged with a first-degree misdemeanor for violating the

CPO. Unable to make bond, which was set at $10,000, Ellison remained in jail pending trial.

{¶ 12} Hauck used his attorney-identification card to visit Ellison in jail and spoke to him at least twice by telephone. Hauck testified that his purpose was to determine whether he could represent Ellison, and he claimed that he "stay[ed] on the sidelines" when he realized that the prosecution might call him as a witness in the case. During the trial-preparation phase of the case, however, Hauck wrote three letters to the arresting officer. While the letters were ostensibly written on Ellison's behalf, Hauck did not obtain prior approval from him or his appointed counsel.

{¶ 13} At the panel hearing, an assistant county prosecutor assigned to Ellison's case testified that Hauck could have been charged with complicity for his role in violating the CPO. But after Hauck invoked his Fifth Amendment right against self-incrimination, the Hamilton County Court of Common Pleas granted him immunity from criminal prosecution so that he could be compelled to testify against Ellison. After the court granted Hauck immunity, Ellison agreed to plead guilty to the lesser charge of attempt to violate a CPO and served approximately two months in jail.

{¶ 14} Hauck testified that he was aware that a CPO had been issued against Ellison while they were discussing and drafting the letter to Ellison's parents, but Hauck claimed that he did not know—and made no effort to ascertain—the contents of that order. Although the board noted that Ellison's testimony largely supported Hauck's claims, it also found that their conversation during a recorded jailhouse telephone call contradicted their testimony. The transcript of that call documents the following exchange:

Mr. Ellison: Okay. Well, let me ask you something. Are you going to be willing to—I mean, you looked over the protection

order. You didn't see any problem with it. Are you willing to, you know, let them know that basically you, as an attorney, had looked it over and didn't see any reason why we couldn't do what we did?

Mr. Hauck: Well, look, I don't want to get in to the legalities. We [were] making a good faith, courteous attempt to communicate. It was me, not you, doing it, okay. When it comes to that time we can decide on what to say, but I'm willing to come in, [and] speak on your behalf.

{¶ 15} The board found that conversation to be more credible than the testimony of Hauck and Ellison and therefore found that Hauck had reviewed the CPO and still believed that it was appropriate to send the letter. The board noted that the last paragraph of the letter, asking Ellison's parents to "file a motion to cancel" the CPO, provided additional evidence that Hauck had reviewed the CPO prior to signing and transmitting the letter.

{¶ 16} The board expressly rejected Hauck's efforts to disclaim his role as a legal professional in this matter, because Hauck's holding himself out as an attorney imparted an air of credibility to the letter to Ellison's parents. Additionally, it found that Hauck acted as an attorney by providing Ellison with his time and advice, encouraging him to write the letter, editing the letter, signing the letter, and returning it to Ellison to send to his parents and also by calling and visiting Ellison in jail. Ellison admitted that he relied on Hauck's knowledge and skills as an attorney and testified that if Hauck had advised him not to send the letter, he would have followed that advice. And the board found that Hauck's conduct supported Ellison's belief that Hauck served as his attorney.

{¶ 17} Having found that Hauck had established an attorney-client relationship with Ellison, the board expressed shock at his poor advice and lack of good judgment. Because Hauck admitted that Ellison had not only fully briefed

6

him on the serious problems in his relationship with his mother but had also told him that she had obtained a CPO against him, the board concluded that the only reasonable course of action for Hauck was to (1) review the CPO, (2) conclude that the contact proposed by Ellison was prohibited, and (3) advise his client not to send the letter.

**{¶ 18}** Therefore, the board found that Hauck violated Prof.Cond.R. 1.1 (requiring a lawyer to provide competent representation to a client) by failing to realize and advise Ellison that writing a letter to his parents would violate the CPO. Because Hauck's assisting Ellison in violating the CPO was illegal, the board also found that Hauck violated Prof.Cond.R. 8.4(b) (prohibiting a lawyer from committing an illegal act that reflects adversely on the lawyer's honesty or trustworthiness).

**{¶ 19}** Based on findings that Hauck and Ellison acted in complicity to circumvent the prohibitions of the CPO by attempting to deceive Ellison's parents into believing that the letter drafted by Ellison was actually from Hauck, the board found that Hauck violated Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). And because Hauck disregarded the CPO and substituted his own judgment for that of the issuing court in the name of friendship, the board also found that he violated Prof.Cond.R. 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice).

**{¶ 20}** In addition, Hauck was not registered as an attorney with this court from September 1, 2013, through April 13, 2014. Although Hauck was never summarily suspended for this violation, *see* Gov.Bar R. VI(6), the board concluded that he continued to practice law while his registration was not in good standing, in violation of Prof.Cond.R. 5.5(a) (prohibiting a lawyer from practicing law in a jurisdiction in violation of the regulation of the legal profession). Hauck admits to this violation.

### Hauck's Objections to the Board's Findings of Misconduct

*Whether Hauck Served as Ellison's Attorney*

{¶ 21} In his first objection, Hauck contends that there is insufficient evidence to support the board's finding that he undertook Ellison's legal representation, let alone that he failed to provide him with competent representation in violation of Prof.Cond.R. 1.1. Hauck argues that he acted as Ellison's friend, not his attorney, and that his chief role in editing Ellison's letter was to encourage him to vent some of his anger before asking his parents for a fresh start. In addition to emphasizing his written disclaimer of any attorney-client relationship, Hauck contends that an effort to bar his testimony on the basis of attorney-client privilege was unsuccessful in Ellison's criminal matter. But the docket in Ellison's criminal case reflects that he entered a plea agreement before the court ruled on the issue of attorney-client privilege.

{¶ 22} We acknowledge that the record contains conflicting evidence regarding Hauck's role in drafting and sending the letter to Ellison's parents. The panel and full board found, however, that the use of letterhead identifying Hauck as an attorney, his recorded telephone conversations with Ellison, and Ellison's admission that he relied on Hauck's knowledge and skills as an attorney to be more credible than the contrary testimony offered by Hauck and Ellison. In exercising our independent review in attorney-discipline cases, we defer to a panel's credibility determination "unless the record weighs heavily against those determinations." *Disciplinary Counsel v. Heiland*, 116 Ohio St.3d 521, 2008-Ohio-91, 880 N.E.2d 467, ¶ 39, citing *Cincinnati Bar Assn. v. Statzer*, 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8.

{¶ 23} The evidence in this case does not weigh heavily against the board's determination that Ellison relied on Hauck's knowledge and skills as an attorney, because Hauck encouraged him to draft and send the letter to his parents. Indeed, the record demonstrates that while Hauck paid Ellison $150 to design and build a

website for Hauck's practice, Ellison returned the full amount to Hauck once he signed the letter in "gratitude" for the work Hauck had done on his behalf. The record also reflects Ellison's unequivocal testimony that had Hauck told him not to send the letter, he would have followed that advice. Because "[a]n attorney-client relationship may be created by implication based upon the conduct of the parties and the reasonable expectations of the person seeking representation," *Cuyahoga Cty. Bar Assn. v. Hardiman*, 100 Ohio St.3d 260, 2003-Ohio-5596, 798 N.E.2d 369, syllabus, we overrule Hauck's objection to the board's finding that he had an attorney-client relationship with Ellison.

{¶ 24} Hauck's argument that he did not provide any legal services to Ellison because his letter did not include legal analysis, skill, citation, or interpretation is likewise without merit. In *Lorain Cty. Bar Assn. v. Zubaidah*, 140 Ohio St.3d 495, 2014-Ohio-4060, 20 N.E.3d 687, ¶ 50, we acknowledged that "permissible conduct" that will not result in a finding of the unauthorized practice of law includes endorsing a person's character, advocating a social issue generally, advancing personal interests, or providing nonlegal advice to a family member. But even if the actual content of Hauck's letter had fallen within those categories, it is his counseling, aiding, and abetting Ellison in the drafting and mailing of the letter in knowing violation of the CPO and his visits to Ellison in jail that elevate his conduct to the practice of law in this matter. We therefore overrule his objection in this regard.

*Whether Hauck Committed an Illegal Act*

{¶ 25} In his second objection, Hauck argues that he did not commit any illegal act in violation of Prof.Cond.R. 8.4(b) because he did not know the specific prohibitions set forth in the CPO issued against Ellison. Therefore, he argues that he cannot be held responsible for aiding or abetting Ellison in his violation of the CPO, because "[a] court's order is binding on a nonparty aider and abetter under Civ.R. 65(D) only to the extent the nonparty has actual notice of the terms of the

order by personal service or otherwise," *Midland Steel Prods. Co. v. Internatl. Union, United Auto., Aerospace & Agricultural Implement Workers of Am., Local 486*, 61 Ohio St.3d 121, 573 N.E.2d 98 (1991), paragraph one of the syllabus.

{¶ 26} Because we have already found that there was sufficient evidence to support the board's finding that Hauck had reviewed the CPO and was aware of its prohibitions, we reject this argument and overrule Hauck's second objection.

*Whether the Restrictions of the CPO Are Unconstitutional*

{¶ 27} In his third objection, Hauck argues that the board erred in overruling his motion to dismiss relator's complaint on the ground that the CPO underlying the complaint violates the First Amendment to the United States Constitution and the Due Process Clauses of the United States and Ohio Constitutions.

{¶ 28} The general rule is that unless an order is void for lack of subject-matter or personal jurisdiction, it must be obeyed until it is set aside by proper proceedings. *State ex rel. Beil v. Dota*, 168 Ohio St. 315, 321-322, 154 N.E.2d 634 (1958), citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303, 67 S.Ct. 677, 91 L.Ed. 884 (1947) ("The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter. One who defies the public authority and willfully refuses his obedience, does so at his peril"). Unless a judgment was issued without jurisdiction or was procured by fraud, it is considered valid, and even though it may be flawed in its resolution of the merits, its integrity is generally not subject to collateral attack in a separate judicial proceeding. *See, e.g.*, *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550, ¶ 25.

{¶ 29} Here, Hauck does not allege that the court that issued the CPO at issue in this case lacked personal jurisdiction over Ellison or subject-matter jurisdiction over the case. Instead, he raises the constitutional argument now to contend that he cannot be found to have violated the Rules of Professional Conduct if the violation is based on an unconstitutional order. Hauck did not challenge the

validity of the CPO at the time he assisted Ellison with violating the CPO. And we have already found that Hauck was aware of the CPO's prohibitions but assisted Ellison anyway. Thus, the validity of the CPO does not affect whether Hauck's actions constituted attorney misconduct. We therefore reject Hauck's attempt to collaterally attack the constitutionality of the CPO in this disciplinary proceeding and overrule his third objection to the board's report.

{¶ 30} Having overruled each of Hauck's objections with respect to the board's findings of fact and misconduct and determining that those findings of fact and misconduct are supported by clear and convincing evidence, we adopt them in their entirety.

### Sanction

{¶ 31} When imposing sanctions for attorney misconduct, we consider several relevant factors, including the ethical duties that the lawyer violated, relevant aggravating and mitigating circumstances, and the sanctions imposed in similar cases. *See* Gov.Bar R. V(13)(A).

{¶ 32} Hauck did not suggest an appropriate sanction for his misconduct. Relator recommended that Hauck be suspended from the practice of law for 12 months, that he be required to submit to counseling with a mental-health professional, that the mental-health professional be required to submit regular reports regarding Hauck's progress, and that Hauck be required to petition this court for reinstatement to the practice of law.

{¶ 33} In mitigation, the panel found that Hauck did not act with a dishonest or selfish motive, displayed a cooperative attitude toward the disciplinary proceedings and made full and free disclosure to the board and to relator, and presented evidence of his good character apart from the charged misconduct. *See* Gov.Bar R. V(13)(C)(2), (4), and (5). And with respect to Hauck's violation of Prof.Cond.R. 5.5(a), the board also accorded some mitigating effect to the fact that

the Office of Attorney Services had failed to provide him with notice either that his biennial registration was due or that it was past due.

{¶ 34} As aggravating factors, the panel found that Hauck has been previously disciplined by this court, has committed multiple offenses, has refused to admit the wrongful nature of all of his misconduct, and has caused great harm to vulnerable people—including members of Ellison's family and Ellison himself, who spent 90 days in jail as a direct result of Hauck's misconduct. Gov.Bar R. V(13)(B)(1), (4), (7), and (8).

{¶ 35} The panel was also troubled by the content of the letter Hauck sent to Ellison's parents in a claimed effort to resolve a family rift. It described the letter as "offensive and accusatory" rather than conciliatory and expressed concern regarding Hauck's failure to appreciate that the letter would have been inappropriate to send—even in the absence of a CPO.

{¶ 36} While appreciating Hauck's goal of reuniting Ellison with his mother, the panel believed that the letter they sent to his parents could be seen by a reasonable person only as making matters worse. And the panel expressed true dismay that Hauck could counsel his client to send that letter without any appreciation of how it would be perceived by the recipients. The panel noted that Dr. Douglas Beech, who conducted an independent psychiatric examination of Hauck, reported: "[Hauck's] religious and personal ethics/beliefs have affected and overridden his professional judgment. While these ethics have guided much sincere and benevolent behavior throughout his life, they have also been an integral part of his misconduct." Citing multiple instances in Hauck's own testimony in which he claimed to be "in a different universe, a different plane" and having problems with "the moral and personal objectivities overcoming what is the rule of law in other ways," the panel was convinced that his moral convictions will continue to override his professional judgment in the future.

12

{¶ 37} The panel compared Hauck's misconduct to the misconduct at issue in two cases cited by relator. *See Akron Bar Assn. v. Markovich*, 117 Ohio St.3d 313, 2008-Ohio-862, 883 N.E.2d 1046 (imposing a one-year suspension with six months stayed on conditions, including an 18-month period of monitored probation, on an attorney who neglected one client's legal matter and abandoned another, filed a misleading dismissal entry with a court, knowingly violated a CPO issued against a client, entered into a business transaction with a client without making required disclosures, commingled personal and client funds, and was found in contempt for failing to conduct himself in a professional manner during court proceedings); *Stark Cty. Bar Assn. v. Osborne*, 62 Ohio St.3d 77, 578 N.E.2d 455 (1991) (imposing a one-year suspension on an attorney with a prior disciplinary record who assisted his client in the deliberate violation of a temporary restraining order). Ultimately, the panel recommended that Hauck be suspended from the practice of law for 12 months, that he be required to submit to an OLAP evaluation and fully comply with all OLAP recommendations, and that he be required to petition this court for reinstatement pursuant to Gov.Bar R. V(25).

{¶ 38} Citing Hauck's prior disciplinary record, Dr. Beech's report, and Hauck's own testimony, the full board concluded that an indefinite suspension with reinstatement subject to the conditions recommended by the panel is necessary to protect the public from future misconduct.

{¶ 39} Hauck objects to the board's recommended sanction, arguing that an indefinite suspension is more punitive than it is protective of the public. He argues that he should be commended—not blamed—for following his Christian beliefs. And quoting scripture, he contends that he should not be condemned but directed to " 'go and sin no more.' "

{¶ 40} We do not adopt Hauck's view but agree with the board's assessment that a period of actual suspension coupled with a petition for reinstatement is necessary to protect the public. We conclude, however, that a two-year suspension

with one year stayed on conditions, combined with certain conditions on Hauck's reinstatement to the practice of law and a period of monitored probation, will better protect the public from future harm.  Therefore, we sustain Hauck's fourth objection, in part.

{¶ 41} Accordingly, John Wesche Hauck is suspended from the practice of law in Ohio for two years with the second year stayed on the conditions that he submit to a mental-health evaluation conducted by OLAP, comply with any and all treatment recommendations resulting from that evaluation, serve a one-year period of monitored probation, make full restitution of $150 to Ellison, and engage in no further misconduct.  If Hauck fails to comply with these conditions, the stay will be lifted and he will serve the entire two-year suspension.  In addition, Hauck shall be required to petition for reinstatement to the practice of law pursuant to Gov.Bar R. V(25).  Costs are taxed to Hauck.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

LANZINGER, J., concurs in judgment only.

_____

Beth I. Silverman; Richard J. Goldberg; and Edwin W. Patterson III, for relator.

John W. Hauck, pro se.

_____