[Cite as *Beavers v. State*, 2019-Ohio-3587.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| REUBIN J. BEAVERS | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28061 |
| | : | |
| v. | : | Trial Court Case No. 2015-CV-2627 |
| | : | |
| STATE OF OHIO | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of September, 2019.

. . . . . . . . . . .

BRADLEY D. ANDERSON, Atty. Reg. No. 0061325 and KEVIN M. DARNELL, Atty. Reg. No. 0095952, 130 West Second Street, Suite 2150, Dayton, Ohio 45402
      Attorneys for Plaintiff-Appellee

KATHERINE BOCKBRADER, Atty. Reg. No. 0066472, TIFFANY L. CARWILE, Atty. Reg. No. 0082522, and JUSTIN T. RADIC, Atty. Reg. No. 0082697, 30 East Broad Street, 26th Floor, Columbus, Ohio 43215
      Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} The State of Ohio appeals from a trial court decision declaring Reubin Beavers a "wrongfully imprisoned individual" under R.C. 2743.48. The state argues that Beavers does not satisfy the statutory definition of "wrongly imprisoned individual" in R.C. 2743.48(A). We agree that Beavers does not satisfy the fourth statutory condition because criminal proceedings against him are still legally permissible. Therefore, we reverse.

### I. The criminal case against Beavers

{¶ 2} Beavers's underlying criminal case has a long history. It began with Beavers's conviction in 1995 and ended in 2013 with the dismissal, without prejudice, of the charges against him. In between, the case, as outlined below, came before this Court no less than seven times.

{¶ 3} In 1995, a jury convicted Beavers of one count of felonious assault and two counts of shooting at or into a habitation, specifically, an illicit gambling club operating in a house. Beavers appealed, challenging the sufficiency of the evidence, and we affirmed in *State v. Beavers*, 2d Dist. Montgomery No. 15265, 2000 WL 84557 (Jan. 28, 2000) (*Beavers I*).

{¶ 4} In 1996, Beavers filed his first petition for post-conviction relief, in which he argued, in part, that his trial counsel was ineffective for failing to call Raney Mease to testify at trial. Mease claimed he had met Beavers in prison after the latter's conviction, after overhearing Beavers describe the case to another inmate. Mease said that he was outside the gambling club during the shooting and saw the shooter and that it was not Beavers. The trial court denied the petition without a hearing, but this court reversed in

*State v. Beavers*, 2d Dist. Montgomery No. 16362 1997 WL 797729 (Dec. 31, 1997) (*Beavers II*). That panel of the court concluded that the trial court should have held an evidentiary hearing to consider Mease's testimony. The trial court held a hearing on remand and again denied Beavers's postconviction-relief petition. That denial was affirmed in *State v. Beavers*, 2d Dist. Montgomery No. 17949, 2000 WL 426164 (Apr. 21, 2000) (*Beavers III*).[1]

{¶ 5} In 2000, Beavers filed a motion for a new trial based on newly discovered evidence. The parties stipulated that a hearing was unnecessary. It was not until 2005 that the trial court denied the motion. Although the parties had stipulated the case would be submitted to the trial court on written and documentary submissions, this court reversed and remanded the case for a hearing in *State v. Beavers*, 166 Ohio App.3d 605, 2006-Ohio-1128, 852 N.E.2d 754 (2d Dist.) (*Beavers V*), concluding that a hearing was "necessary to resolve the issues," *Beavers V* at ¶ 22. The trial court held a hearing on remand and again denied the motion for a new trial. This court reversed and remanded in *State v. Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604 (*Beavers VI*). That panel concluded that if a jury were to hear Mease's testimony, along with all the other evidence, there was a "strong probability that the jury would have reasonable doubt, and acquit." *Beavers VI* at ¶ 37.

{¶ 6} The state filed an application for reconsideration of our judgment in *Beavers VI*, arguing that it had its own newly discovered evidence, contradicting Mease's testimony, discovered after the trial court's hearing on the new-trial motion. The state

---

[1] Beavers also filed a second post-conviction petition, which was denied. We affirmed the denial in *State v. Beavers*, 2d Dist. Montgomery No. 20572, 2005-Ohio-1205 (2d Dist.) (*Beavers IV*).

asked that this court remand for a new hearing on the new-trial motion so that the state could present its additional evidence. The state's application was denied because the state was relying on evidence outside the record. But it was noted that on remand, because the trial court had not specifically been directed to order a new trial, it was within the court's discretion to hear new evidence on the motion. The trial court decided to hold another hearing; then, finding that Mease lacked credibility, the court denied the motion for a new trial. This court then reversed and remanded in *State v. Beavers*, 2d Dist. Montgomery No. 24671, 2012-Ohio-3711 (*Beavers VII*). This time we directed the trial court to order a new trial, saying that credibility was primarily for a jury to decide.

{¶ 7} On September 16, 2013, the trial court, at the request of the state, entered an order dismissing the charges against Beavers without prejudice. Well before *Beavers VI* or the new trial ordered in *Beavers VII*, Beavers completed his prison sentence; he was released from prison in 2008, and he was released from parole the year following his release from prison.

## II. Beavers's action for wrongful imprisonment

{¶ 8} In May 2015, Beavers filed a civil action to be declared a wrongfully imprisoned individual under R.C. 2743.48. Division (A) of the statute defines a "wrongfully imprisoned individual" as one who satisfies these five conditions:

(1) The individual was charged with a violation of a section of the Revised Code by an indictment or information, and the violation charged was an aggravated felony or felony.

(2) The individual was found guilty of, but did not plead guilty to, the particular charge or a lesser-included offense by the court or jury involved,

and the offense of which the individual was found guilty was an aggravated felony or felony.

(3) The individual was sentenced to an indefinite or definite term of imprisonment in a state correctional institution for the offense of which the individual was found guilty.

(4) The individual's conviction was vacated, dismissed, or reversed on appeal, the prosecuting attorney in the case cannot or will not seek any further appeal of right or upon leave of court, and no criminal proceeding is pending, can be brought, or will be brought by any prosecuting attorney, city director of law, village solicitor, or other chief legal officer of a municipal corporation against the individual for any act associated with that conviction.

(5) Subsequent to sentencing and during or subsequent to imprisonment, an error in procedure resulted in the individual's release, or it was determined by the court of common pleas in the county where the underlying criminal action was initiated that the charged offense, including all lesser-included offenses, either was not committed by the individual or was not committed by any person.[2]

**{¶ 9}** The state moved for summary judgment on the grounds that Beavers could not satisfy the fourth or fifth condition. He could not satisfy the fourth condition, the state argued, because criminal charges could be brought against him until September 16, 2019, when the six-year statute of limitations expired, six years after the dismissal of the

---

[2] Amendments to R.C. 2743.48(A) went into effect on March 22, 2019, that significantly changed what it takes to satisfy the fourth and fifth conditions. Because this action was already pending, it is the prior version of the statute that applies. *See* R.C. 1.58(A)(1).

charges. The state argued that Beavers could not satisfy the fifth condition because his release from prison was not a result of an error after sentencing.

{¶ 10} Beavers filed an amended complaint in which he conceded that his "cause of action has not yet accrued because it remains possible for a prosecuting attorney to refile criminal charges against him due to the tolling provisions of R.C. 2903.13(1)." (Amended Complaint, ¶ 27). Beavers also acknowledged that the "entire period of time from the date of Plaintiff's arrest (October 23, 1994, the day after the date of the alleged offenses) through the date of the entry of nolle prosequi (September 16, 2013) is excluded for purposes of calculating the six-year statute of limitations." (Amended Complaint, ¶ 28). He also conceded that the statute of limitations would not run until September 16, 2019.

{¶ 11} The state again moved for summary judgment and so did Beavers. The state reasserted its arguments that Beavers could not satisfy the fourth and fifth conditions of the statutory definition of "wrongfully imprisoned individual" because criminal charges could be brought against him until September 16, 2019, and because his release from prison was not a result of an error after sentencing. Beavers moved for partial judgment on whether the statute of limitations for his wrongfully-imprisoned-individual claim had already begun to run or whether it did not start to run until after September 16, 2019. In a written decision entered on July 17, 2017, the trial court rejected the state's argument that Beavers could not satisfy the fourth statutory condition. The court concluded that factual issues remained as to that condition and ordered supplemental briefing. The court also rejected the state's fifth-condition argument, concluding that our decisions concerning Beavers's postconviction-relief petition and motion for a new trial showed that an "error in procedure" had occurred—the criminal court's failure to grant a

new trial. The trial court said that it would permit the parties to present evidence on the other way that Beavers could satisfy the fifth condition, by proving that he did not commit the offenses.

{¶ 12} A trial was held at which several eyewitnesses to the shooting testified. Beavers testified that he was not the shooter. Raney Mease also testified that Beavers was not the shooter. Rosalyn Wilcox, Beavers's niece, testified that Beavers was in her car when the shooting occurred, so he could not have been the shooter. The trial court also admitted transcripts of the prior testimony of witnesses who were unavailable. Two of these witnesses offered key testimony for the state. One witness was Arthur Farmer, who was the doorman at the illegal casino. He testified at the 1995 trial that he noticed Beavers at a gambling table in the basement and "he was, loud, and boisterous, and drunk." (Court's Exhibit V, at 138). After daylight, the operation had shut down and the sun was out when he heard loud banging at the front door but he did not immediately answer. When he did go to the door he looked out the "three little windows" and "I seen this guy here [Beavers] reach in the back seat of a car, pull a rifle out, cock the rifle, aim it at the house, and I hit the ground. Gunshots started flying in the door." (*Id.* at 144). He recognized Beavers as the shooter, testifying as follows: "Well, from down there gambling just a couple hours earlier, because he was loud, and I recognized him. He had on the same clothes." (*Id.* at 145). Farmer was shot in the foot while crawling on the floor.

{¶ 13} The other trial witness whose testimony by transcript was introduced was Agnes Maston. Her ex-husband, Robert Maston, was the operator of the gambling club, although she had never been there. Her trial testimony was that Beavers, who she had known for three or four years and had spoken with "on more than one occasion" (Court's

Exhibit VI, at 220), called her the day of the shooting and asked her to get in touch with Robert Maston for him. Beavers told her that he had shot at the gambling house and "[h]e told me to tell Robert that if there were any damages done to the house, that he would pay for it." (Id. at 223). Later that day, Agnes was at Beaver's sister's house with her son to pick up some gym shoes, and Beavers was present. "[A]s I came in the door, well, he [Beavers] grabbed and hugged me; and he said that he was sorry, and he was crying, because he was really upset, he was crying, and he said that at that point he did not know that he had shot anyone" (*Id.* at 225).

{¶ 14} In a written decision entered on June 18, 2018, the trial court, concluded that Beavers had satisfied the fourth and fifth statutory conditions of the "wrongfully imprisoned individual" definition in R.C. 2743.48(A). Regarding the fourth condition, the court concluded that the 2013 dismissal should have been with prejudice to avoid violating Beavers's constitutional due-process and speedy-trial rights. The court held that these rights were violated by the delay in retrying Beavers after *Beavers VI* and *Beavers VII*, primarily because the delay was unfair and a new indictment would violate due process. As to the fifth condition, the court concluded that the condition was satisfied in two ways. One, an error in procedure had occurred—the criminal court had refused to grant Beavers a new trial after *Beavers VI* and *Beavers VII*. And two, Beavers had proven that he did not commit the offenses. Having already concluded that Beavers satisfied the first three conditions of the "wrongfully imprisoned individual" definition, the trial court therefore declared that Beavers was a wrongfully imprisoned individual.

{¶ 15} The state appeals.

## II. Analysis

{¶ 16} The state assigns two errors to the trial court. The first challenges the trial court's conclusion that Beavers satisfied the fourth condition of the "wrongfully imprisoned individual" definition, and the second challenges the court's conclusion that he satisfied the fifth condition.

### A. The fourth statutory condition

{¶ 17} The first assignment of error alleges:

> The trial court erred in concluding that charges cannot be brought against Beavers as provided in R.C. 2743.48(A)(4).

{¶ 18} The fourth condition of the "wrongfully imprisoned individual" definition is this:

> The individual's conviction was vacated, dismissed, or reversed on appeal, the prosecuting attorney in the case cannot or will not seek any further appeal of right or upon leave of court, and no criminal proceeding is pending, can be brought, or will be brought by any prosecuting attorney, city director of law, village solicitor, or other chief legal officer of a municipal corporation against the individual for any act associated with that conviction.

R.C. 2743.48(A)(4). This condition "expressly requires the claimant to prove that no criminal proceedings can or will be brought against [him] for any act associated with [his] prior conviction. The use of the phrase 'no criminal proceedings * * * can * * * or will be brought' was clearly intended by the General Assembly to bar recovery to a claimant against whom criminal proceedings are still factually supportable and legally permissible following reversal." *LeFever v. State*, 10th Dist. Franklin No. 12AP-1034, 2013-Ohio-4606, ¶ 26.

{¶ 19} The trial court concluded that further criminal proceedings against Beavers are not legally permissible. This conclusion was based upon the trial court's determination that the 2013 dismissal without prejudice should have been with prejudice, because bringing criminal proceedings against Beavers now would violate his constitutional speedy-trial and due-process rights. "[I]t is unquestionable," said the court, "that plaintiff has been denied due process in the failure to grant a new trial and * * * accepting the nolle prosequi [dismissal] as additional permission to continue to hang a renewed prosecution over him would be joining in the denial of due process of law guaranteed to plaintiff." We disagree. Because the issues here involve only questions of law, our review is de novo. *See In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, ¶ 3.

1. *The dismissal without prejudice was valid.*

{¶ 20} We begin with the trial court's conclusions regarding the dismissal of the charges without prejudice. The trial court's conclusion that the dismissal order was invalid because it should have been with prejudice was an improper collateral attack upon the order. "Unless a judgment was issued without jurisdiction or was procured by fraud, it is considered valid, and even though it may be flawed in its resolution of the merits, its integrity is generally not subject to collateral attack in a separate judicial proceeding." *Cincinnati Bar Assn. v. Hauck*, 148 Ohio St.3d 203, 2016-Ohio-7826, 69 N.E.3d 719, ¶ 28. Here, the court that entered the dismissal order in the criminal case had jurisdiction, and there was no allegation of fraud.

{¶ 21} Furthermore, it was within the trial court's discretion to dismiss the charges without prejudice. *See State v. Jones*, 2d Dist. Montgomery No. 22521, 2009-Ohio-1957, ¶ 13 ("A trial court has discretion over the issue of dismissal."). Concerning dismissal with

prejudice, we have said that "since neither Crim.R. 48(A) nor Crim.R. 48(B) expressly provides for a dismissal with prejudice, a dismissal or nolle with prejudice may be entered only where there is a deprivation of a defendant's constitutional or statutory rights, the violation of which would, in and of itself, bar further prosecution." (Citations omitted.) *Id.* In other words, a court *may* enter a dismissal with prejudice, but only if a constitutional or statutory violation bars further prosecution. Here, as discussed below, none of Beavers's constitutional or statutory rights have been violated so that further prosecution is barred. Consequently, the trial court could not have dismissed the charges with prejudice when the dismissal was entered. Therefore we conclude that the charges against Beavers were validly dismissed in 2013 without prejudice.

2. *There was no violation of the constitutional right to a speedy trial.*

{¶ 22} The trial court concluded that the dismissal without prejudice violated Beavers's constitutional right to a speedy trial and his right to due process. We conclude that the dismissal did not violate either constitutional right. We consider first Beavers's right to a speedy trial.

{¶ 23} The Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution guarantee a criminal defendant the right to a speedy trial. *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, ¶ 6, citing *Klopfer v. N. Carolina*, 386 U.S. 213, 222-223, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), and *State v. Ladd*, 56 Ohio St.2d 197, 200, 383 N.E.2d 579 (1978). The U.S. Supreme Court has stated that the constitutional right to a speedy trial applies "from arrest or indictment through conviction." *Betterman v. Montana*, __ U.S. __, 136 S.Ct. 1609, 1613, 194 L.Ed.2d 723 (2016). In other words, the right does not attach until a defendant is

arrested or formally accused and "detaches upon conviction." *Id.* The constitutional speedy-trial provisions also govern "[t]he time limit for bringing a person to trial whose conviction has been overturned on appeal." *State v. Hull*, 110 Ohio St.3d 183, 2006-Ohio-4252, 852 N.E.2d 706, paragraph two of the syllabus.

{¶ 24} The U.S. Supreme Court has explained that "[p]rior to conviction, the accused is shielded by the presumption of innocence. * * * The Speedy Trial Clause implements that presumption," said the Court, "by 'prevent[ing] undue and oppressive incarceration prior to trial, * * * minimiz[ing] anxiety and concern accompanying public accusation[,] and * * * limit[ing] the possibilities that long delay will impair the ability of an accused to defend himself.' " *Betterman* at 1614, quoting *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). It thus follows that "[w]hen the government no longer holds a defendant under arrest or bail for a charge, the Speedy Trial Clause of the Sixth Amendment does not apply until the government rearrests or later indicts the defendant." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 91, citing *United States v. Loud Hawk*, 474 U.S. 302, 310-312, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986).

{¶ 25} Beavers's constitutional speedy-trial right detached when he was convicted in 1995. It has never reattached. First, we have never reversed Beavers's convictions. We have reversed only postconviction orders denying relief and a new trial. Second, Beavers completed his sentence and was released from prison in 2008. He was never again under arrest or bail for the charges in this case. So after 2008, the speedy-trial provision has never applied, and it will not apply again until the state re-indicts Beavers. Therefore, bringing criminal proceedings against Beavers now would not violate his

constitutional right to a speedy trial.

3. *There is no violation of the right to due process.*

{¶ 26} Excessive pre-indictment delay implicates a defendant's due process rights. *Betterman*, __ U.S. __, 136 S.Ct. at 1613, 194 L.Ed.2d 723, citing *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). The U.S. Supreme Court has explained that, while "statutes of limitations provide the primary protection against delay," the Due Process Clause acts "as a safeguard against fundamentally unfair prosecutorial conduct." *Id.*, citing *Lovasco* at 789. "[D]ue process," the Court has said, "serves as a backstop against exorbitant delay." *Id.* at 1617. A "comparable due-process protection [exists] under Article I, Section 16 of the Ohio Constitution." *Adams* at ¶ 97.

{¶ 27} In deciding whether due process has been violated, a court must consider not only whether the defendant will suffer prejudice but also the reasons for delay. *Lovasco* at 789-790, citing *Marion*, 404 U.S. at 324-325, 92 S.Ct. 455, 30 L.Ed.2d 468. "[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796. Indeed, the Ohio Supreme Court has said that there must be "substantial prejudice to [a defendant's] right to a fair trial." *Adams* at ¶ 98, citing *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir.1997), and *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 51.

{¶ 28} The trial court here made clear in its written decision that it very strongly believed that if criminal proceedings were now initiated, Beavers would suffer substantial prejudice to his right to a fair trial. But the unusually long time from the 1994 event until a potential retrial is not the fault of the state any more than the defendant. Moreover, the

state would be hampered by the absence of prior witnesses and the fading of memories just as much as the defense. Actual prejudice cannot be fully known, shown or determined until the state actually pursues new proceedings. What is known is that after our reversal and remand in October 2009, Beavers was not granted a new trial because the state had newly discovered evidence which we recognized allowed the trial court to take new evidence on the motion for a new trial. *See Beavers VII*, 2d Dist. Montgomery No. 24671, 2012-Ohio-3711, at ¶ 14-16. It is also known that after our reversal and remand in August 2012, Beavers was not granted a new trial because the state dismissed the charges. We do not know why after the 2013 dismissal the state has not brought new criminal proceedings against Beavers. Perhaps it was nothing more than the notion that it would be a hollow victory to retry a defendant who has already served and completed any possible sentence. Unless and until the state pursues a retrial, it cannot be determined whether bringing criminal proceedings violates Beavers's right to due process.

4. *There was no violation of the statute of limitations.*

**{¶ 29}** The trial court did not decide whether the applicable statute of limitations has expired. The parties agree that limitations period is six years. The state's position is that the limitations period expires on September 16, 2019, six years after the charges against Beavers were dismissed. In several places in the record, Beavers agrees with this position. We will not decide the issue. We simply note that the statute of limitations is not a legal barrier to bringing criminal proceedings against Beavers.

**{¶ 30}** In sum, contrary to the trial court's conclusions, criminal proceedings against Beavers are still legally permissible. Thus, the fourth condition of the "wrongfully imprisoned individual" definition is not satisfied. Given this, there is no need to discuss

the fifth statutory condition.

{¶ 31} The first assignment of error is sustained.

### III. Conclusion

{¶ 32} Because criminal proceedings can still legally be brought against Beavers, he does not satisfy the definition of a "wrongly imprisoned individual" in R.C. 2743.48(A). The trial court's judgment is reversed.

. . . . . . . . . . . . .

HALL, J., concurs:

{¶ 33} I agree with Judge Tucker's analysis and conclusion that criminal proceedings against Beavers are still legally permissible, so the fourth condition of the "wrongfully imprisoned individual" definition is not satisfied. I write separately to address the second assignment of error, in regard to the fifth statutory condition, which, in my opinion, also should be sustained to completely resolve the assignments before us.

### B. The fifth statutory condition

{¶ 34} The second assignment of error alleges:

The trial court erred in finding that the prior appellate court holdings reversing the denial of a new trial satisfied the requirements of R.C. 2743.48(A)(5) and that Beavers had shown by a preponderance of the evidence that he was actually innocent.

{¶ 35} The fifth condition of the "wrongfully imprisoned individual" definition is this: Subsequent to sentencing and during or subsequent to imprisonment, an error in procedure resulted in the individual's release, or it was determined by the court of common pleas in the county where the underlying criminal

action was initiated that the charged offense, including all lesser-included offenses, either was not committed by the individual or was not committed by any person.

**{¶ 36}** By its own terms, this fifth condition may be satisfied in one of two ways: "(1) subsequent to sentencing and during or subsequent to imprisonment, 'an error in procedure resulted in the individual's release' or (2) the charged offense (and any lesser included offense) was not committed by the individual or no crime was committed at all (actual innocence)." *Doss v. State*, 135 Ohio St.3d 211, 2012-Ohio-5678, 985 N.E.2d 1229, ¶ 12, quoting R.C. 2743.48(A)(5). The trial court here concluded that Beavers satisfied the fifth condition in both ways.

### 1. *A procedural error did not result in release*

**{¶ 37}** The trial court here found that the "error in procedure" was the refusal to grant Beavers a new trial after our 2009 reversal and remand in *Beavers VI* and our 2012 reversal and remand in *Beavers VII*. But the Ohio Supreme Court has held that the "subsequent event" cannot be "a judicial determination that an error occurred." *Mansaray v. State*, 138 Ohio St.3d 277, 2014-Ohio-750, 6 N.E.3d 35 ¶ 9. Even if the failure to grant a new trial was an "error in procedure," it was not what resulted in Beavers's release from prison. Beavers was released from prison in 2008, a year before our judgment entered in *Beavers VI*, and his release was the result of having completed his sentence. Thus, Beavers did not establish the first way of satisfying the fifth condition.

### 2. *Beavers did not prove his innocence*

**{¶ 38}** The trial court here concluded that Beavers also established the second way of satisfying the fifth condition, which requires "an affirmative showing of innocence"

by a preponderance of the evidence. *Doss* at ¶ 14. The court's decision contains almost nothing from which we can analyze its view of the evidence or the credibility of the witnesses. A single paragraph was all the court wrote: "The Court heard the evidence at the trial and the arguments of counsel, and enters the verdict that the plaintiff has proved by a preponderance of the evidence that he did not commit the crimes charged against him for which he was convicted and sentenced and imprisoned in 1995. Beavers has met the requirement in R.C. 2743.48(A)(5) of showing he was wrongfully convicted."

{¶ 39} The state argues, in essence, that the trial court's conclusion was against the manifest weight of the evidence. The manifest-weight standard in a civil case is the same as in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. When conducting a manifest-weight review, " '[t]he [reviewing] court    * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *Eastley* at ¶ 12 (quoting the same). But "[i]n weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984), fn. 3.

{¶ 40} At the bench trial in this case, several witnesses testified and the prior testimony of several witnesses who were unavailable was admitted. I review the key testimony presented and what I believe are the only reasonable conclusions that can be

drawn regarding certain aspects of the events.

{¶ 41} Beavers testified first that he was innocent. He testified similarly at his 1995 jury trial. He said that on October 22, 1994, he drove a red car to the "boot joint," which was located in the described house. He admitted that he had a weapon on him. He admitted that the boot joint was an illegal business where alcohol was sold: "Q. And you participated in that illegal activity, correct? A. Yes." (Tr. 91). He admitted he had a face-to-face conversation with the doorman, Arthur Farmer (*Id.* at 94): "Q. You had a gun on you during that face-to-face with Arthur Framer * * * A. Yes, I probably did." (*Id.* at 95). Because Beavers did not want to be patted down, he went outside and put the loaded weapon in his car and then returned to the boot joint. (*Id.* at 96-97).

{¶ 42} Beavers said that, after losing around $35, he went home to get more money and left his weapon at home. While gambling, Beavers said that the man who ran the joint, Robert Maston, started cheating and that he (Beavers) was "vocal" and "talking trash" to Maston. (Tr. 54, 55). Beavers stayed until Maston closed the joint down. Beavers also said that he got into an argument with a man named Tony Milliner and that Tony "hit me upside the head with a pistol" (*Id.* at 59) and "grazed me across the head and told me to check it in." (*Id.* at 110).

{¶ 43} Beavers, driving his friend Mike D.'s red car, went to a nearby pay phone from which he could see the boot joint; Beavers called Mike D., because he knew Mike was looking for Milliner. (*Id.* at 64-65, Jury Trial Tr. 333-334). Mike was at Beavers's apartment. Beavers then called Terry Watkins (Beavers's son's mother) and told her to pick up Mike and bring him down to where Beavers was. Eventually, Mike, Watkins, Rosalyn Clark (Beavers's niece), and another woman met Beavers in Beavers's car.

Beavers said he got into the driver's seat of his car with Watkins and Clark, and Mike and the other woman got into Mike's car. Those in Beavers's car returned to the boot joint. Beavers pulled up in front of the house and he admitted that it was he who knocked on the door but got no response, so he got back in the car and started to drive away. As he was pulling away, he heard gunshots behind him. "Q. Instead of continuing away from the gunshots, you get out of your car? A. Yes." (Tr. 122). Beavers looked back and saw Mike D. holding a rifle and shooting at the house. Beavers did not call the police.

{¶ 44} Later that morning, Beavers admitted that he called Agnes Maston, Robert Maston's ex-wife, to get Robert's number. She gave Beavers Robert's pager number, and Beavers paged him. When Robert did not call, Beavers called Agnes back and told her about the place being shot up. He later saw Agnes and told her that he felt responsible for the shooting. Beavers denied telling Agnes that he was the shooter. On cross-examination at his trial, Beavers admitted that, during his second call with Agnes, he testified that "I told her I was responsible for it." (Tr. 127). He claimed he felt responsible because he brought Mike D. into the situation. However he did not tell her that Mike was the shooter. Beavers also admitted that when he later saw Agnes, he did not tell her that Mike was the shooter.

{¶ 45} Raney Mease testified next. Mease said that in 1994 he had close-cropped, short hair and that he was 22 years old. He was from Columbus but was visiting friends in Dayton and they went to the gambling joint. Mease drank too much and went out to his van to sleep. When he woke up, he thought that the boot joint was still open and started walking toward the house. Then he saw a man holding a gun and stopped. Mease testified that the man was a black male, stocky build, 5' 7" to 5' 9" with "nappy"

hair, and a skin complexion darker than his own. (Tr. 154-155). Mease backed away, then turned and ran to his van. As he ran, he heard gunshots. Mease got into the van and raced away. After driving a couple of blocks, Mease decided to go to a place nearby where he had seen police cars gathered the previous night. Mease found the location, pulled up, and shouted to the police officers he saw outside that the house up the street was getting shot up. None of the officers seemed to take notice of what Mease had told them, and they continued to their cruisers and left. Mease was not asked for his name, contact information, or any further details of what he had seen, so he left and eventually returned to Columbus. Mease said that he saw the shooter's face and that the shooter was not Beavers.

{¶ 46} On cross-examination, Mease testified that he met Beavers in prison. Beavers was serving his sentence in this case, and Mease was serving a sentence for involuntary manslaughter, aggravated burglary, and aggravated robbery. Mease had committed the manslaughter offense in Columbus just three days before the shooting in this case.[3] Mease said that he overheard Beavers describing this case to another inmate. Beavers too testified that Mease had overheard him talking about his case and that Mease "volunteered some information." (Tr. at 79-80). Mease admitted that the prison meeting was "a hell of a coincidence." (*Id.* at 162). He also admitted that this was not the first time that he had testified that a person was innocent of the crime for which the person had been convicted. In fact, Mease previously had submitted a postconviction-relief affidavit in support of Ebenezer Waddell, who shot and killed Frank Tention. Mease later testified

---

[3] *See State v. Mease*, 10th Dist. Franklin No. 95APA05-614, 1996 WL 112551 , *1 (March 14, 1996) (noting that the date of Mease's offense was October 19, 1994).

that he became involved in that postconviction petition after meeting Waddell in prison. *State v. Waddell*, 10th Dist. Franklin No. 98AP-676, 1999 WL 52975, *3 (Feb, 2, 1999) (upholding the trial court's denial of the petition in part because of "Mease's lack of credibility").

{¶ 47} Rosalyn Wilcox (née Clark), Beavers's niece, testified at the hearing that she accompanied Watkins to pick up her uncle that morning. As they were driving away from the joint after picking up Beavers, she heard shooting, got scared, and ducked down. She did not see the shooter but said that it could not have been Beavers because he was in the car with her and the shots were coming from behind them, outside the car. Wilcox said Beavers slowed the car and looked out an open door, but her story was inconsistent with Beavers's testimony that he stopped the car and got out to look back at Mike D. shooting at the house. Wilcox admitted that, although she knew that her uncle was not the shooter, for about six months after he was arrested until his 1995 trial she never contacted the police to tell them that her uncle was not the shooter. She also had testified at his trial but apparently was not believed by the jury, which found him guilty.

{¶ 48} Braden Carlisle's testimony at the 1995 trial was admitted as an exhibit. He said that he saw a man with a revolver on the sidewalk and that the man was not Beavers. Carlisle said that he too came in contact with Beavers because they were in jail together after the shooting. On cross-examination, Carlisle said that he saw the shooter standing in the yard. He admitted that he already knew Beavers because Beavers and his (Carlisle's) brother were friends.

{¶ 49} Virgil Meadows's testimony at the 1995 trial was that he was near the boot joint that morning, driving by at about 7:30 or 8:00 in the morning looking for a girl he

knew only as "Pepper," a girl Beavers used to see. Meadows said that shortly before the shooting he was riding in a car west on Kammer turning left toward the boot joint on Woodward when he saw Beavers driving away at the intersection. It was after Meadows's car turned onto Woodward that he heard gunshots and saw a black male, who he could not describe, with a gun in front of the house. Curiously, Meadows testified he saw Beavers when Beavers was turning left onto Kammer (eastbound) from Woodward: "Q. Did you actually see him [Beavers] turn left and go east? A. Yes. Q. You're sure of that? A. Yes." (Trial T. 439 Exhibit III). Of course, Beavers's testimony is that he drove straight south through the intersection on Woodward at Kammer when the shots began. (Jury Trial Tr. 341, Exhibit F). Beavers said then he "pulled over to the right side of Woodward," south of Kammer, "stepped out of my car and looked back." (Jury Trial Tr. 342). Meadows admitted that he did not contact police or anyone else, even after learning that Beavers had been charged with the shooting and knowing that someone else was the shooter.

{¶ 50} Terri Watkins's jury trial testimony was also admitted as an exhibit. She was a long-time friend of Beavers and the mother of his son. Watkins said that she and Rosalyn Wilcox picked up Mike and his girlfriend and drove them in Beavers's car to meet Beavers. She said that after Beavers knocked on the door of the house, he got into the driver's seat of his car with her and Rosalyn, and they drove away. According to Watkins, as they were driving away, someone started shooting at the house, but it was not Beavers. A day or so later, she found out that Beavers had been arrested, but Watkins never told the police that Beavers was not the shooter.

{¶ 51} The state's primary evidence was the testimony given at the 1995 trial by Arthur Farmer and Agnes Maston, corroborated by Robert Maston. Farmer identified

Beavers as the shooter. Farmer was the doorman for the boot joint, saw Beavers, and watched him gamble. Beavers was "loud, and boisterous, and drunk" and was "using profanity and cursing," which made Farmer take notice. (Jury Trial Tr. 138-139). A few hours after everyone had left, Farmer heard a loud bang on the front door but did not answer. Shortly thereafter, he walked to the door and looked out. He saw a man pull a rifle out of a car, aim it at the house, and start shooting. Farmer said that he saw the shooter's face and recognized Beavers "from down there just a couple hours earlier," because he "had on the same clothes." (Tr. at 145). Farmer told police that he recognized the shooter from earlier in the night but did not know the shooter's name at that time. But Farmer was not entirely truthful to the police. When the police showed up, he told them that his name was "Arthur Brown," because he had an outstanding warrant, and he continued to call himself Brown throughout his interactions with the police that day. Farmer was also a heroin addict who says he quit using heroin the day before the shooting. He admitted that he was drinking that night, and after working all night, Farmer was sleeping right before the shooting occurred.

{¶ 52} Agnes Maston testified that she had known Beavers for three or four years. She said that on October 22, 1994, around 8:00 a.m., she received a call from him asking for Robert Maston's phone number. About 15 to 20 minutes later, Beavers called back. During this second call, Beavers told Agnes that he had taken his gun to the gambling joint but left it in his car. He then admitted to shooting at the house and said that he wanted Agnes "to contact Robert so he could talk to Robert about taking care of the damages." (Tr. at 223). When Agnes saw Beavers in person later that morning, he was crying. He "grabbed and hugged" her and "said he was sorry." (*Id.* at 225, 244). Robert Maston

testified at the 1995 trial too, and his prior testimony was also admitted. He said that he received a call from Agnes and that she told him what Beavers had said about his willingness to pay for the damage he had done to the boot joint house.

**{¶ 53}** Sergeant Jonathan Ross also testified for the state. He said that in 1994 he was an officer with the Dayton Police Department. He was on duty on October 22, 1994, and he heard shots around 7:30 a.m. Before he left the station, an older black male in his late 40s or early 50s with bushy hair pulled up in a dark colored van that "didn't have windows in it," (Tr. at 302) and told him about the gunshots. "Q. So it couldn't have been a young, late teens, early '20s man? A. No, not at all." (*Id.* at 303). Mease had previously testified that in October 1994 he was 22 years old and was "pretty certain" he had a "fade" haircut. (Defendant's Exhibit H at 29). A fade is a neatly trimmed style with varying lengths on top but short and tapered, faded, on the bottom. When Sergeant Ross arrived at the boot joint, Farmer told him that there had been pounding on the door and that when he went to investigate, he saw a black male pull a rifle out of a car and start shooting toward the house. Farmer said that the shooter had been in the joint earlier. Sergeant Ross's prior testimony at the 1995 trial was also admitted. In that testimony, Ross had said that after Farmer heard the pounding on the front door, he looked out the window and saw a black man whom he had seen earlier that evening walk to a red car, pull out a rifle, and started firing at the house.

**{¶ 54}** The parties also submitted a stipulation of facts on April 20, 2018, one of which was that Reuben Beavers was convicted of aggravated robbery in Montgomery County in 1982, which was a prior aggravated felony and an offense of violence. Although there was not an indicted count for this violation, his admitted possession of the loaded

firearm was a felony violation of R.C. 2923.13, having weapons under disability.

*Analytical framework relating to weighing the evidence*

**{¶ 55}** In the unique circumstances of this case, the evidence, and its evaluation, does not start in a vacuum. At Beavers's criminal trial, Arthur Farmer, Agnes Maston and Robert Maston gave testimony that in varying degrees implicated Beavers. Because their trial testimony was presented by written trial transcript, the trial court was in no different position than this court in evaluating their testimony. There is no reason to doubt the testimony of Arthur Farmer, who testified he saw Beavers commit the shooting, no reason to doubt the testimony of Agnes Maston to whom Beavers admitted the shooting, and no reason to doubt Robert Maston's testimony that Beavers had lost money gambling and that Beavers had Agnes call Robert to express sorrow for shooting up the house. These witnesses testified before the jury that found Beavers guilty in spite of the testimony at trial from Beavers, his niece Rosalyn Wilcox, the mother of his son Terri Watkins, jail inmate Braden Carlisle, and passerby Virgil Meadows, all of whom said the shooter was not Beavers. The jury found Farmer and the Mastons more credible than the five defense witnesses, by proof beyond a reasonable doubt, despite each of the defense witnesses' testimony that Beavers was not the shooter.

**{¶ 56}** Careful and complete review of Raney Mease's testimony leads me to conclude he was evasive, inconsistent, and untruthful. In my view, Mease's testimony on a whole reveals the story he and Beavers have concocted is simply not true. Mease admitted that it was an incredible coincidence that he ran into Beavers in prison. But, exponentially more incredible, to the point of astonishment, is that this happened to Mease twice at about the same time. Beavers filed a postconviction petition, or

amendment, on September 23, 1996, accompanied by the affidavit of Raney Mease claiming Mease was a witness to the boot-joint shooting. Ebenezer Waddell filed a post-conviction relief petition in Franklin County three days earlier, September 20, 1996, accompanied by an affidavit of Raney Mease in which Mease claimed to have been a witness to the murder of Frank Tention. Ebenezer Waddell, who Mease also happened to meet in prison, filed that petition claiming Waddell acted in self-defense because Mease saw the victim holding a gun behind his back and was bringing his hand from behind him.[4] Mease was well-schooled with exculpatory prisoner affidavits. Beginning in 1995 he submitted three in his own case from a co-defendant, Tucker, recanting Tucker's trial testimony against Mease. (Tr. 164-166). *See State v. Mease*, 10th Dist. Franklin No. 00AP-294, 2000 WL 1693436, *3-4 (Nov. 14, 2000).

{¶ 57} One example, of which there are too many to recite, of Mease's faulty testimony is whether his confrontation with the suspect occurred in the dark or light. Mease testified: "It's early – it's about to be – like the sun was about to stop (sic) peeking and come up but **it was still dark**. Q. It was definitely dark? A. **Early morning dark**. I -- there's a difference" (Emphasis added.) (Tr. 186). Farmer said, "[I]t was sunlit, early, 7:30, 8:00. The sun was out." (Jury Trial Tr. 146). Even Beavers's own testimony was that it was light when he was over at the Metro Market, from where he called Mike D. well before the shooting: "Q. Sun up? A. Sun's up when I had him? Q. When you are over at Metro Market. A. I wouldn't say the sun is up, but it's daylight. Q. It's daylight? A. Right. I don't recall whether the sun was up or not. Q. But it's daylight out; it's daytime? A. Right." (Jury Trial Tr. 375).

---

[4] *Waddell*, 10th Dist. Franklin No. 98AP–676, 1999 WL 52975 (Feb. 2, 1999).

{¶ 58} However, the failed lynchpin of Mease's story is Mease's testimony that he was the man, documented in the discovery-provided police report, who stopped by police officers to report shots fired, a tale which makes no sense and is disproven. Mease would have been on the run, having participated in a homicide three days earlier in Columbus, where he lived, and where someone had shot up his mother's and aunt's houses. (Tr. 170). He said he left Columbus to get out of all the drama and "it's like you go on vacation." (*Id*. at 171). He left the car he ordinarily drove at his mother's house so people would believe he was staying there. (*Id*. 176). He borrowed the van because "it was more luxurious than my vehicle.* * * [I]t was a better ride." (*Id*. at 177). Mease claimed he drove the van from Columbus to Dayton and before going to sleep he made sure he "locked all the doors" (*Id*. at 150). At the time he was 22 years old and had a "fade" haircut.

{¶ 59} In my view, it is highly unlikely with the Columbus "drama" that Mease would stop to chat with police. It appears his claim that he was the one who stopped is designed to match the police report, to which Beavers and Mease had access when working on postconviction relief petitions in the prison library. But what was not in the report, and unanticipated, was the bench trial testimony of Sgt. Jonathan Ross, who described the man in the van as "an older black male and he had kind of bushy hair." (Tr. 303) "Q. * * * [A]re you sure that he was an older man with bushy hair? A. Yes, he would have been approximately in his 50's, late 40's. Q. Okay. So it couldn't have been a young, late teens, early '20s (sic) man? A. No, not at all." (*Id*. at 303). Additionally not in the report was Sgt. Ross's testimony that the van "didn't have windows in it." (*Id*. at 302). The likelihood that Mease drove a "luxurious" van, without windows, from Columbus to Dayton, or that he locked the doors to sleep in it nearby the boot joint, without the security of windows, is nil.

The description of the man, and the description of the van, each independently means Mease was not the man in the van. The combination of those items, a much older man, a different hairstyle, and a van without windows, means Mease was not the man who stopped to report the shooting; his testimony was concocted to coordinate with the discovery police report, and his testimony was decidedly false.

Conclusion

{¶ 60} I repeat that the 1995 jury was the only barometer for face-to-face evaluation of the credibility of the three crucial witnesses against Beavers as opposed to the five witnesses, including himself, who testified he was not or could not have been the shooter. The witnesses against Beavers were found credible, and the witnesses for him were not by proof beyond a reasonable doubt. The only difference in the bench trial below is the addition of the incredible, inaccurate, preposterous testimony of Raney Mease. If five witnesses saying Beavers wasn't the shooter was not enough to raise reasonable doubt, I fail to see how the addition of Raney Mease's flawed story moves the needle from guilty to not guilty. But even if a new or different evaluation arguably could raise reasonable doubt, in my opinion there was no reasonable interpretation of the evidence that could lead to a conclusion that Beavers was innocent by a preponderance of the evidence.

{¶ 61} In my analysis, I am fully aware of, and have applied, our deferential standard of review. I am convinced the trial court lost its way and the manifest weight of the evidence does not show Beavers was actually innocent. Therefore, I would sustain the second assignment of error.

DONOVAN, J., dissents:

**{¶ 62}** I disagree. I would adopt the thorough and well-reasoned opinion of the trial court.

**{¶ 63}** The trial court's determination that the nolle prosequi without prejudice is invalid is supported by the record. R.C. 2941.33 mandates that "The prosecuting attorney shall not enter a nolle prosequi in any cause without leave of the court, or good cause shown in open court. A nolle prosequi entered contrary to this section is invalid." As noted in *State v. Dare,* 7th Dist. Belmont No. 16 BE 11, 2017-Ohio-7585, ¶ 19: "Since the 'motion' was not properly made or granted here, the order dismissing the criminal charge was invalid." Thus, at the time the trial court herein conducted an evidentiary hearing, it could have correctly deemed the nolle without prejudice a nullity, resulting in a legally and factually correct determination that Beavers's constitutional rights had been denied and that the state was barred from prosecuting him. "A void judgment is a nullity and open to collateral attack at any time." *State v. Fischer,* 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 40. "To be subject to collateral attack, the judgment must be relevant to the relief sought or to some right in controversy before the court." *See Kingsborough v. Tousley,* 56 Ohio St. 450, 458, 47 N.E. 541 (1887). It is highly relevant and critical to Beavers's civil claim of wrongful imprisonment whether he can still be criminally prosecuted in Montgomery C.P. No. 1994-CR-3052. He cannot.

**{¶ 64}** I would affirm.


Copies sent to:

Bradley D. Anderson
Kevin M. Darnell
Katherine Bockbrader
Tiffany L. Carwile

Justin T. Radic
Hon. Richard Skelton